UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Magistrate No. 26-344 |
| ) | |
| OMARI HUDSON ) | |
| ) | |
| AND IN THE MATTER OF THE SEARCH OF: ) | |
| ) | |
| AN IPHONE WITH A DARK BLUE CASE ) | |
| SEIZED FROM OMARI HUDSON ON ) | Magistrate No. 26-345 |
| FEBRUARY 26, 2026 AND IN SECURE ) | |
| STORAGE AT THE PITTSBURGH BUREAU ) | |
| OF POLICE COMPUTER CRIMES UNIT ) | |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANT**

I, Task Force Officer William Churilla, having been duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. Your Affiant, Task Force Office William Churilla, being duly sworn according to law, aver that the following is true and correct to the best of my knowledge, information and belief and is based on personal knowledge or information provided by reliable sources.

2. Your Affiant is a member of both the Pittsburgh Bureau of Police (PBP) and is also a Task Force Officer with the Drug Enforcement Administration (DEA). As a Pittsburgh police officer, I am empowered under state law to make arrests for violations of state criminal laws, and I am also empowered to execute state search warrants. As a DEA Task Force Officer, I am empowered under federal law to make arrests for violations of federal criminal laws, and I am also empowered to execute federal search warrants.

3. I have a High School Diploma, as well as a bachelor's degree in criminology and business management from Duquesne University. After my 1988 graduation from Duquesne University, I worked for approximately 5 years with juveniles adjudicated of crimes at the Allegheny Academy Juvenile Facility. In 1997, I began to work full-time as a police officer for the City of Pittsburgh. I spent the first several years as a patrol officer in the Zone 2 section of Pittsburgh which encompasses neighborhoods including the Hill District. I remain employed with the PBP and became a Detective in approximately 2007.

4. In 2013, I was assigned to Narcotics and Vice where I primarily investigated drug and firearm offenses. I have purchased drugs including marijuana, cocaine, heroin and fentanyl in an undercover capacity on many occasions and have been involved as a back-up officer in many undercover purchases by other officers. I have been involved in numerous controlled purchases, of various types of drugs, by cooperating individuals. I have obtained numerous search warrants regarding drug and firearm violations and have been involved in numerous similar search warrants obtained by my fellow police officers.

5. I have been asked to render an expert opinion on many occasions regarding whether various circumstances show that drugs were possessed for distribution, as opposed to personal use. I have qualified and testified as a narcotics expert in court more than a dozen times. My relevant trainings include the initial Pittsburgh Police Academy training, as well as the "Top Gun" Narcotics Investigation course, Pennsylvania Electronic Surveillance "A" certification training, ATF "Characteristics of Armed Individuals" training, and interrogation and interview training. My drug and firearm experience comes from working not only with many other members of the PBP, but with numerous other local, state and federal investigators including the ATF, FBI and DEA. I have been involved in over 1000 arrests in my career, many involving guns, drugs or both.

6.  I am also experienced in reviewing the contents of cellular telephones associated with drug trafficking as I have examined the contents of hundreds of cellular telephones associated with drug trafficking and firearm possession.

7.  This affidavit has two purposes. The first is in support of a criminal complaint charging Omari Hudson with Felon in Possession of Firearms, in violation of 18 U.S.C. § 922(g)(1), for conduct that occurred on February 26, 2026. The second purpose is in support of a search warrant of a cellular telephone described more fully below recovered from Hudson on February 26, 2026 that authorized law enforcement to search the cellular telephone for violations of 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm and Ammunition), 18 U.S.C. § 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime), and 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Possession with the Intent to Distribute Controlled Substances) (collectively "TARGET OFFENSES").

## ITEM TO BE SEARCHED

8.  An iPhone with a dark blue case, seized on February 26, 2026 from the person of Omari Hudson (hereinafter **TARGET DEVICE 1**). **TARGET DEVICE 1** is currently securely stored at the Pittsburgh Bureau of Police Computer Crimes Unit, and pictures of **TARGET DEVICE 1** are included in Attachment A.

## PROBABLE CAUSE

9.  I have researched HUDSON's criminal history and it includes felony convictions for the following offenses, all in the Allegheny County Court of Common Pleas, at the following docket numbers:

    - Carrying a Firearm without a License - CP-02-CR-0000586-1997;
    - Robbery - CP-02-CR-0016170-1999;

- Robbery (multiple counts) - CP-02-CR-0017155-1999;

- Robbery - CP-02-CR-0017156-1999;

- Robbery - CP-02-CR-0017158-1999; and

- Robbery - CP-02-CR-0001672-2000.

10. On February 26th, 2026, Pennsylvania State Parole agents Nartowicz and Baldonieri conducted a compliance check for Omari Hudson (Hudson) at 24 Sylvania Ave. in Pittsburgh, Pennsylvania (the Residence). Agent Nartowicz advised that they were doing a compliance check for the growth of marijuana plants inside of the Residence and notified Pittsburgh Bureau of Police (PBP) Detectives that there were multiple marijuana plants found in plain view.

11. Based on that conduct, Pennsylvania State Parole agents placed Hudson under arrest and recovered **TARGET DEVICE 1** from his person.

12. At the time of his arrest, Hudson was placed on a couch in the living room of the residence. For safety, officers conducted a wingspan search and recovered two firearms from a satchel that was located on a recliner next to the couch.

13. The two firearms recovered were a black and silver Taurus Millennium G2 9mm bearing S/N: TKU36639 with magazine and a black Springfield XDS.45ACP bearing S/N: S3306001 with magazine.

14. PBP Detective Baek conducted an NCIC query of both firearms. The Millennium G2 reported at stolen returned stolen

15. PBP detectives also observed multiple marijuana plants in plain view that appeared to be healthy.

16.     Based on that information, PBP detectives applied for a search warrant. While waiting for the search warrant, an object fell from the pants of Hudson. Hudson retrieved the object and would not let it go, and a struggle occurred. As Hudson was taken to the ground, he placed the object into his mouth and attempted to eat it.

17.     Parole agents then retrieved their taser, and Hudson ceased the struggle and spit the object out. The object was recovered by PBP Detective Baek from the floor and it was a large bag of suspected crack cocaine that broke open. Later field tests confirmed that the suspected crack was in fact cocaine.

18.     While Hudson was being escorted to an ambulance, a PBP detective observed and recovered a white knotted baggy of suspected cocaine from Hudson's belly button.

19.     The PBP authored a search warrant for the Residence and for Hudson's 2012 Nissan Armada bearing PA registration: NCD6129. The warrants were approved.

20. The following was evidence was recovered during the execution of the search warrants:

- Indicia for Hudson;
- Fourteen marijuana plants;
- Marijuana;
- Cutting Agents;
- 67 pressed suspected fentanyl or methamphetamine pills;
- More than $15,000 in US Currency;
- Suspected cocaine;
- Drug packaging materials;
- Three digital scales;

- Two additional firearms recovered from basement HVAC system/air duct – a Black Taurus PT 24-7 G2 9mm (Serial # : TDX75503) and two magazines with live ammunition and a Black and Gray SCCY CPX-2 9mm (Obliterated Serial #) and magazine with live ammunition;

21. PBP detectives confirmed that the Taurus PT 24-7 G2 9mm (Serial # : TDX75503) was stolen.

22. Collectively, the items recovered suggest that the narcotics recovered were intended for distribution and not personal use and that Hudson was involved in narcotics trafficking.

23. Based on my training and experience, the recovered firearms and ammunition were not manufactured in the Commonwealth of Pennsylvania and thus moved in interstate commerce prior to Hudson's possession.

24. In my 29 years of law enforcement experience, I am aware that it is a common practice for drug and firearm traffickers to use a cellular telephone, like **TARGET DEVICE 1**, to further their illegal activities, and that evidence of the TARGET OFFENSES is likely to be found on **TARGET DEVICE 1**.

25. Based on my training and experience, I am aware that targets of narcotics trafficking investigations utilize cellular telephones and electronic devices to not only arrange meetings with their drug customers but also speak with fellow co-conspirators as well as their drug sources of supply. I am also aware that these targets also utilize multiple cellular telephones and electronic devices at one time in an effort to not only thwart detection by law enforcement but also to compartmentalize their drug trafficking customers to one phone and/or electronic device, their

co-conspirators to another phone and/or electronic device, and their drug source of supply to yet another phone and/or electronic device.

26. I am also aware that people in general, and those involved in firearms and/or drug trafficking (either as a distributor or customer) in particular, keep their cellular telephones on their persons or in close reach. For drug traffickers and firearms traffickers alike, the cellular phone has become a tool to facilitate criminal activity; specifically, the phone is used to arrange meetings with customers, to speak with fellow co-conspirators, and to coordinate with sources of supply.

27. Based upon my training and experience, I am aware that it is generally a common practice for drug traffickers to store the names and phone numbers of drug customers and photographs and video detailing illegal activities in cellular telephones and electronic devices. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, and/or will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier(s) and the trafficker's dealer(s). Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

28. Drug traffickers also often take group photographs with conspirators posing with paraphernalia, money, firearms and/or drugs. Many cellular telephones, including **TARGET DEVICE 1**, have a camera feature that is readily capable of capturing and storing these group photos.

29.     Drug traffickers often store phone numbers and contact information in the directories of their cellular phones.

30.     Based on my experience and familiarity with cellular telephones like **TARGET DEVICE 1** have voicemail and telephone directory features, as well as camera features which allow the user to take photographs and store them in the cellular phone's memory card. Based on my experience and training, statements by other law enforcement officers, and personal observations, I know that because of the storage capacity of cellular telephones, the portability of cellular telephones, the ease with which information stored on a cellular telephone may be accessed and/or organized, and the need for frequent communication in arranging narcotics transactions, cellular telephones are frequently used by individuals involved in drug trafficking. In particular, I and other law enforcement officers have found that information frequently maintained on cellular telephones includes the contact numbers of other co-conspirators, contact numbers for narcotics customers and stored photographs of criminal activities. This evidence will come in the form of caller identification information, call log information, telephone numbers, address information, notes or other identification information, as well as opened and unopened voicemail and/or text messages, photographs, videos and information about access to the Internet.

31.     I am further aware that firearms are "tools of the trade" for drug traffickers, as drug traffickers often rely on firearms to protect themselves, their drug stash, and their narcotics proceeds, from robbery and/or theft, as drug traffickers are often reluctant to contact law enforcement in the event they are the victim of any such crimes, and as such are often the targets of such crimes.

32.     Based on my training and experience, I am aware that individuals such as HUDSON, who cannot legally purchase firearms often have to either illegally purchase them "on

the street," or contact third parties and request the third parties to purchase firearms for them (referred to as a "straw purchase"). I am aware that, in order to arrange/conduct either of these transactions, individuals often communicate via cellular phone with the firearms trafficker and/or straw purchaser. In so doing, individuals often exchange photographs of firearms they have for sale, or internet links and/or photographs of firearms they want to purchase.

33. I am similarly aware that individuals such as HUDSON will often conduct internet searches regarding firearms, to include firearms for sale in the area, to research and/or learn more about different types of firearms, and often to research the specific firearms in their possession.

34. As set forth above, this affidavit seeks authorization to extract data from **TARGET DEVICE 1** to search that data for evidence of the TARGET OFFENSES.

35. Based on my training and experience, the following types of evidence will likely be found on **TARGET DEVICE 1**:

- Incoming and outgoing call, text and other chat application message logs;
- Contact lists;
- Calendars;
- Photo and video galleries and related metadata;
- Sent and received text, video and audio messages/files;
- Records related to online searches and sites viewed via the internet;
- Information revealing the user of the cellular telephone and the telephone number associated with the cellular telephone;
- Online or electronic communications sent and received, including email, chat, and instant messages;
- Records of FaceTime communications;

- Records related to location of the cellular telephone;

- Notes; and

- Voice messages.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

36. As described above, this Application seeks permission to search **TARGET DEVICE 1** for evidence of violations of the TARGET OFFENSES.

37. Based on my knowledge, training, and experience, I know that files or remnants of such files can be recovered months or even years after they have been sent/received, accessed, captured, downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files including photos or videos of firearms, downloaded to a storage medium can be stored for years at little or no cost. Similarly, chat communications can be stored locally on the device and are also able to be backed up to remote servers. Users can generally use these remote backups to recover deleted or lost communications.

38. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on an electronic device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

39. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, an electronic device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

40. Wholly apart from user-generated files, electronic device storage media—in particular, electronic devices' internal storage—contain electronic evidence of how an electronic

device has been used, what it has been used for, where it was located, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Electronic device users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

41. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

42. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the cellular telephone consistent with the warrant. The examination requires technicians to extract data from the cellular telephone using forensic software. That data will then be searched for the evidence described above.

43. As the cellular telephone will be in law enforcement custody, I ask permission for law enforcement to search these devices at any time day or night.

## **CONCLUSION**

44. For the reasons set forth above, there is probable cause to believe that Omari Hudson was a Felon in Possession of Firearms on February 26, 2026, in violation of 18 U.S.C. § 922(g)(1).

45. For the reasons set forth above, there is probable cause to believe that evidence of the TARGET OFFENSES will be found on **TARGET DEVICE 1**.

46. The above information is true and correct to the best of my knowledge, information, and belief.

/s/ *William Churilla*
William Churilla,
Task Force Officer
Drug Enforcement Administration

Sworn and subscribed before me, by telephone pursuant to Fed. R. Crim. P. 4.1(b) (2) (A), this 27th day of February 2026

_____
HONORABLE CHRISTOPHER B. BROWN
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

**TARGET DEVICE 1:** An iPhone with a dark blue case, seized on February 26, 2026 from the person of Omari Hudson and currently in secure storage at the Pittsburgh Bureau of Police Computer Crimes Unit and pictured below:



**ATTACHMENT B**
**LIST OF ITEMS TO BE SEARCHED FOR AND SEIZED**

1. Records, communications stored at the time the warrant is served (i.e., no real-time communications will be intercepted and searched during service), data, and textual and graphic files (including photographs and videos), evidencing who used the device and when and from where or a violation of Title 18, United States Code, Sections 922(g)(1) or 924(c), or Title 21, United States Code, Sections 841 or 846, including:

- Incoming and outgoing call, text and other chat application message logs;
- Contact lists;
- Calendars;
- Photo and video galleries and related metadata;
- Sent and received text, video and audio messages/files;
- Records related to online searches and sites viewed via the internet;
- Information revealing the user of the cellular telephone and the telephone number associated with the cellular telephone;
- Online or electronic communications sent and received, including email, chat, and instant messages;
- Records of FaceTime communications;
- Records related to location of the cellular telephone;
- Notes; and
- Voice messages.

2. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form. However, no real-time communications will be intercepted and searched during execution of the search warrant.

3. In searching the cellular telephone, investigating officers and agents may examine all of the data contained in the cellular telephone to view its precise contents and determine whether the cellular telephone and/or its data falls within the items to be seized as set forth above. In addition, they may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth above.